IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARY HUGHES,                             :          Case No. 1:14 CV 1111

                    Plaintiff,           :

v.                                       :

COMMISSIONER OF SOCIAL SECURITY,  :        MEMORANDUM DECISION AND ORDER

                    Defendant.           :

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have the undersigned Magistrate Judge conduct all proceedings in this case including ordering the entry of final judgment.  Plaintiff seeks review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the Briefs of the parties (Docket Nos. 17 and 19).  For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On August 2, 2007, Plaintiff filed applications for DIB and SSI, alleging that she became unable to work when her disability began on August 23, 2005 (Docket No. 12, pp. 189-191 of 408).  The applications were denied initially on November 27, 2007 (Docket No. 12, pp. 167-169, 170-172 of 408) and upon reconsideration on March 13, 2008 (Docket No. 12, pp. 173-175, 176-178 of 408).  On April 24, 2008, Plaintiff requested an administrative hearing which was conducted in Cleveland, Ohio, on January 22, 2010,

before Administrative Law Judge (ALJ) Dennis James LeBlanc. Plaintiff, represented by counsel, and Bruce Holderead, a Vocational Expert (VE), appeared and testified (Docket No. 12, pp. 136, 181-182 of 408). At the hearing, the onset date was amended to July 3, 2006 (Docket No. 12, p, 139). On March 25, 2010, ALJ LeBlanc rendered an unfavorable decision denying Plaintiff benefits under DIB and SSI[1] (Docket No. 12, pp. 109-120 of 408). The Appeals Council found no reason to review the ALJ's decision; therefore, the ALJ's decision denying benefits became the final decision of the Commissioner on April 20, 2012 (Docket No. 12, pp. 8-10 of 408). Plaintiff filed a timely Complaint in this Court seeking judicial review of the Commissioner's decision denying her benefits (Docket No. 1).

## III. THE ADMINISTRATIVE HEARING.

### A. PLAINTIFF'S TESTIMONY.

Plaintiff was 30 years old at the time of the hearing. She had completed the ninth grade. Although she had a driver's license, Plaintiff did not drive much due to the unpredictable nature of her anxiety attacks which were accompanied by fear and blurred vision. Having been evicted from her sister's home, Plaintiff resided with Lafayette Veal, and his minor son in a lower floor unit (Docket No. 12, pp. 145, 147, 148, 154 of 408).

Plaintiff's employment history included primarily work in sales at Spencer Gifts, a novelty and gag gift store. In the position of assistance sales manager, Plaintiff was responsible for leading and guiding the sales team, providing customer service and supervising employees (Docket No. 12, p. 149 of 408). Plaintiff's mental health deteriorated and she stopped working when her husband died in 2005. Against medical advice, Plaintiff returned to work when her employer advised that they "would have to let her job go" if she did not

---

[1]

On December 19, 2011, Plaintiff was awarded SSI from June 2011 through December 2011 (Docket No. 12, pp. 15-30 of 408).

return.  Plaintiff stopped working again on July 3, 2006 due to poor performance accompanied by symptoms of depression, namely, irregular crying episodes, isolationism, audio hallucinations and difficulty concentrating.  Plaintiff was unable to return to work at Spencer Gifts because it closed (Docket No. 12, pp. 141-142, 150, 239 of 408).

Living alone after the death of her spouse exacerbated her fear of people and caused Plaintiff to become more isolated and depressed.  Taking advantage of the treatment options available, Plaintiff obtained mental health consultations.  Plaintiff suggested to her psychiatrist that the dosages of her primary medications, Cymbalta and/or Alprazolam, be increased to control and/or eliminate her sleep disorders, the auditory and visual hallucinations and anxiety attacks (Docket No. 12, pp. 142-143, 144, 145, 147 of 408).  Plaintiff used self-control to limit the crying episodes and with Mr. Veal's assistance, she was getting out more to curtail her fears and feelings of paranoia (Docket No. 11, pp. 144-145 of 408).

In terms of household chores, Plaintiff admitted that she could do laundry and occasionally, she assisted with other tasks; however, she spent most of her day watching television.  Mr. Veal drove her to the store, physician appointments and family visits.  Plaintiff had accompanied her cousin to Texas for a visit with her aunt (Docket No. 12, pp. 145, 148, 155, 156 of 408).

**B.     THE VE'S TESTIMONY.**

Based on Plaintiff's employment record, the VE considered that during the past 15 years Plaintiff performed significant work in the sales and collection services.  Plaintiff performed the sales position at the light exertional level and the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a publication that the Social Security Administration takes notice of reliable job information available in the national economy[2],

---

[2]

Www.occupationalinfo/org.

categorized the sales position as semiskilled work with a specific vocational preparation (SVP) of over one month up to and including three months to learn the techniques, acquire the information and develop the facility needed for average performance[3].  Plaintiff performed the debt collector job at sedentary to light exertional levels while the collector position as it is generally performed in the national economy, was performed at the light exertional level.  The collector position was considered semiskilled work which required over three months and up to and including six months to learn the techniques, acquire the information and develop the facility needed for average performance of the position (Docket No. 12, p. 158 of 408).

The ALJ posed the *first* hypothetical question to the VE:

Assume an individual of the same age, education and work experience as Plaintiff, who is able to perform a full range of exertional work but she is limited to performing simple, routine tasks, but not in a fast paced production environment such as on an assembly line.  She is able to interact with the general public on an occasional and superficial basis.  Do you believe that this individual could perform any unskilled work  existing in the national, regional or local economy?

The VE responded that his answers were consistent with the DOT and that the following medium exertion, unskilled jobs would be available:

| Job | DOT | Number of positions in Northeast Ohio/Ohio/National Economy | SVP |
|---|---|---|---|
| Cleaner II | 919.687-014 | 2,500/12,000/278,000 | 1–Short demonstration only. |
| Automobile Detailer | 915.687-034 | 2,500/10,000/250,000 | 2–Anything beyond a short demonstration up to an including one month. |
| Campground Attendant | 329.683-010 | 2,000/7,000/200,000 | 2 |

(Docket No. 12, p. 159 of 408).

The VE expounded on the compatibility of the campground attendant position with the ability to

---

[3]

Www.onetonline.org/help/online/svp).

interact with the general public on an occasional and superficial basis, explaining that this job would entail minimal and superficial contact with the public. Rather, the job would involve cleaning and general maintenance of the grounds and trails, checking the buildings and sanitizing the pools (Docket No. 12, pp. 160, 161 of 408).

In the *second* hypothetical, Plaintiff's counsel asked the VE to:

Assume that the hypothetical individual would be off task 15 to 20% of the time during a normal workday and workweek. Would there be any jobs that this person could perform?

The VE opined that the hypothetical individual would not be able to perform any of the aforementioned jobs or other jobs in the local, state or national economies (Docket No. 12, p. 160 of 408).

In the *third* hypothetical, Plaintiff's counsel posited a question based on the report that suggests Plaintiff has a poor ability to work in coordination or proximity to others without being unduly distracted and also indicating that the individual would have a poor ability to complete a normal workday and workweek:

If the public or co-workers distracted the hypothetical individual three or more times daily while the hypothetical individual cried and was otherwise distracted by a mental condition, would there be jobs that this person could perform?

The VE suggested that if the crying was sufficiently loud as to make a scene five to ten minutes at a time, three or more times per day, there would be no jobs for the hypothetical individual (Docket No. 12, pp. 160, 161, 162 of 408).

## IV. EDUCATIONAL BACKGROUND.

During the academic school year 1995/1996, Plaintiff had failing grades in all subjects and the ninth grade proficiency examination. She had equally poor attendance, with 103 absences prior to her withdrawal from school on December 12, 1996 (Docket No. 12, pp. 282-283 of 408).

## V. MEDICAL EVIDENCE.

Plaintiff's spouse was electrocuted in the scope of his employment in August 2005 (Docket No. 12,

p. 305 of 408).  On October 1, 2005, Plaintiff was admitted to the University Hospital of Cleveland for observation after expressing thoughts of joining her deceased spouse.  Routine chemistry tests did not detect alcohol abuse and her sodium and urea nitrogen levels were lower than the desirable measurement or value in healthy individuals (Docket No. 12, pp. 287-298 of 408).

On October 5, 2005, Dr. Rakesh Ranjan, M.D., a specialist in psychiatry, noted that Plaintiff was suffering with a major depressive disorder (MDD) with acute grief reaction which adversely affected her ability to function.  Dr. Ranjan recommended that her employer grant an indefinite leave of absence from work.  On November 2, 2005, Dr. Ranjan certified that Plaintiff was first unable to work due to illness on October 2, 2005 and that she may be able to return to work on December 5, 2005 (Docket No. 12, p. 298 of 408; www.healthgrades.com/physician/dr-rakesh-ranjan.)

Under the supervision of a Licensed Social Worker, on June 25, 2007, personal counselor Lisa Marks conducted a comprehensive interview from which she was able to ascertain Plaintiff's mental and physical health, medical, sociological and psychological backgrounds.  Ms. Marks concurred that Plaintiff had MDD with acute grief reaction and she recommended further assessment by a psychiatrist and counselor to help manage her grief and depression (Docket No. 12, pp. 300-314 of 405).

Ms. Marks summarized Plaintiff's mental health disorders and its affect on her personal well-being using the multi-axial approach adopted by the American Psychiatric Association (APA) in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER (DSM), a manual which covers all mental health disorders and potential treatment, as follows:

| AXIS | WHAT IT MEASURES | MS. MARKS' OPINION |
|---|---|---|
| I.<br>Clinical symptoms. | This is what is typically thought of as the diagnosis (e.g., depression, schizophrenia, social phobia). | Depressive disorder not otherwise specified (DDNOS); anxiety and bereavement. |

6

| II.<br>Personality Disorders and Intellectual Disabilities. | Axis II is for assessing personality disorders and intellectual disabilities. These disorders are usually lifelong problems that first arise in childhood, are accompanied by considerable social stigma because they are suffered by people who often fail to adapt well to society, and these disorders can seem untreatable and difficult to pinpoint. | Deferred. |
|---|---|---|
| III.<br>Physical conditions that play a role in the development, continuance or exacerbation of Axis I and II disorders. | Physical conditions such as brain injury or HIV/AIDS that can result in symptoms of mental illness are included here. | Back problems, headaches and sleep problems. |
| IV.<br>Severity of psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Financial and unemployment. |
| V.<br>Highest level of functioning. | The clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |

(Docket No. 12, p. 309 of 408).

For the Bureau of Disability Determination, Mr. Richard C. Halas, M.A., a clinical psychologist, conducted a two-pronged evaluation consisting of a clinical interview and an individual psychological evaluation designed to determine the current levels of adjustment and mental status used to facilitate long-term disability determination.  During the clinical interview conducted on October 22, 2007, Mr. Halas observed that:

1.  Plaintiff was assessed as being far more dependent than independent.
2.  Plaintiff's most unusual or concerning behavior was a flat, hesitant, and tentative presentation.
3.  Plaintiff's quality of relating to Mr. Halas was "rather flat and constricted."

4.   Plaintiff's speech pattern was slow, hesitant and constricted.
5.   Plaintiff understood the ramifications and the need for the evaluation.
6.   Plaintiff was neither impulsive nor compulsive.
7.   Plaintiff's quality and amount of eye contract was poor.
8.   Plaintiff was adequately nourished but not overweight.
9.   Plaintiff admitted to feelings of hopelessness, helplessness and worthlessness but she was not suicidal.
10.   Plaintiff showed to have low levels of anxiety.
11.   Plaintiff appeared to have little difficulty sitting, standing, or walking.
12.   Plaintiff had a poor to below average ability to lift, carry and handle objects.
13.   Plaintiff's hearing and capacity for traveling were intact (Docket No. 12, pp. 315, 316 of 408).

Mr. Halas, too, used the DSM to summarize Plaintiff's mental health disorders and its affect on her

personal well-being:

| AXIS | WHAT IT MEASURES | MR. HALAS' OPINION |
|---|---|---|
| I.<br>Clinical symptoms. | This is what is typically thought of as the diagnosis (e.g., depression, schizophrenia, social phobia). | DDNOS. |
| II.<br>Personality Disorders and Intellectual Disabilities. | Axis II is for assessing personality disorders and intellectual disabilities. These disorders are usually lifelong problems that first arise in childhood, are accompanied by considerable social stigma because they are suffered by people who often fail to adapt well to society, and these disorders can seem untreatable and difficult to pinpoint. | None. |
| III.<br>Physical conditions that play a role in the development, continuance or exacerbation of Axis I and II disorders. | Physical conditions such as brain injury or HIV/AIDS that can result in symptoms of mental illness are included here. | Deferred for medication examination. |
| IV.<br>Severity of psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Psychosocial stressors such as unemployment, financial concerns, health concerns, dependency upon boyfriend, and the death of husband. |

| V.<br>Highest level of functioning. | The clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |
|---|---|---|

(Docket No. 12, pp. 315, 317-318 of 408).

Finally, Mr. Halas assessed the four work-related mental abilities:

1.    Plaintiff had a moderate limitation in the mental ability to relate to others, including peers, supervisors, and the general public.
2.    Plaintiff's mental ability to follow through with simple one and two-step instructions and directions remained intact.
3.    Plaintiff's mental ability to maintain attention to do simple, repetitive tasks was intact.
4.    Plaintiff's mental ability to withstand the stresses and pressures associated with most day-to-day work settings was assessed as having moderate limitations.
5.    Plaintiff was able to manage her own funds in an appropriate, practical and realistic manner (Docket No. 12, p. 318 of 408).

Dr. Cynthia Waggoner, Psy.D., a state agency psychologist, reported her ratings of the degree of functional limitations resulting from Plaintiff's impairments in the PSYCHIATRIC REVIEW TECHNIQUE form, a special technique that identifies the need for additional evidence to determine impairment severity; considers and evaluates functional consequences of the mental disorder relevant to the ability to work; and organizes and presents the evaluator's findings in a clear, concise, and consistent manner.  Dr. Waggoner concurred that from July 3, 2006 through November 1, 2007, Plaintiff had a medically determinable impairment, namely DDNOS; however, such impairment did not precisely satisfy the diagnostic criteria for 12.04 Affective Disorders.  Furthermore, Dr. Waggoner assessed Plaintiff's degree of functional limitations based on the extent to which her impairments interfered with the ability to function independently, appropriately, effectively, and on a sustained basis.  Considering these factors as to the quality and level of Plaintiff's overall functional performance, Dr. Waggoner concluded:

| FUNCTIONAL LIMITATION | DEGREE OF LIMITATION |
|---|---|
| Restriction of activities of daily living | Mild |
| Difficulties in maintaining social functioning | Moderate |
| Difficulties in maintaining concentration, persistence or pace | Moderate |
| Episodes of Decompensation, each of extended duration. | None |

(Docket No. 12, pp. 320-333 of 408; https://secure.ssa.gov/poms: DI 24505.025).

Dr. Waggoner also completed the MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT, a form that requires the evaluator to assess mental activity within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis.  Based on all of the record evidence, Dr. Waggoner concluded that Plaintiff had moderate limitations in the ability to:

1. Understand and remember detailed instructions.
2. Carry out detailed instructions.
3. Maintain attention and concentration for extended periods.
4. Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
5. Interact appropriately with the general public.
6. Accept instructions and respond appropriately to criticism from supervisors.
7. Respond appropriately to changes in the work setting.

Dr. Waggoner concluded that Plaintiff was capable of performing simple routine tasks in an environment with minimal contact with others due to her anxiety (Docket No. 12, pp. 334-336 of 408).

Dr. Vicki Casterline, Ph.D., a state agency psychologist, reviewed the evidence in the file on March 5, 2008 and affirmed Dr. Waggoner's assessments as written (Docket No. 12, pp. 360-361 of 408).

On November 15, 2007, Dr. Eulogio R. Sioson, M.D., a geriatrician, administered a manual muscle test to evaluate the function and strength of individual muscles and muscle groups.  Dr. Sioson observed Plaintiff hold her shoulders, elbows, wrists, fingers, hips, knees, feet and great toes against maximal resistance (Docket No. 12, p. 338 of 408; www.healthgrades.com/physician/dr-eulogio-sioson).

During the clinical examination, Dr. Sioson learned that Plaintiff's complaints of chest pain in the breast area were attributed to bronchitis, she had no history of fracture, dislocation or herniated discs in the mid and lower back and she admitted having auditory and visual hallucinations, poor sleep quality and loss of appetite. Dr. Sioson observed that:

1. Plaintiff was not emotionally labile and she was able to maintain attention and concentration.
2. Except for Plaintiff's complaints of pain, there was no neuromusculoskeletal data showing objective findings that would affect Plaintiff's work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting, hearing, speaking and traveling.
3. Plaintiff had less than a normal range of motion in her cervical spine, shoulders, dorsolumbar spine, hips and knees.
4. Plaintiff had a normal range of motion in her ankles, elbows, wrists, hands and fingers (Docket No. 12, pp. 338-341, 346- of 408).

Plaintiff commenced treatments at Connections, a provider of behavioral healthcare, with a psychiatric nurse and counselor. Dr. Barbara Rodriguez, M. D., supervised the medication component of the treatment. Notable visits to Connections include:

| November 15, 2007 | The counselor determined that Plaintiff had been medication compliant (Docket No. 12, p. 358 of 408). |
| November 19, 2007 | The dosage of Trazodone, a medication used to treat depression, was changed (Docket No. 12, pp. 352-353 of 408). |
| December 13, 2007 | The counselor reinforced coping mechanisms to assist Plaintiff overcome anxiety over her upcoming flight to Texas and her husband's death (Docket No. 12, p. 354 of 408). |
| December 14, 2007 | A benefits' specialist discussed with Plaintiff the Social Security process to reduce anxiety (Docket No. 12, p. 356 of 408). |
| December 14, 2007 | Plaintiff met with the counselor to discuss coping mechanisms given her finances, family issues and mental health (Docket No. 12, p. 357 of 408). |
| January 4, 2008 | Dr. Rodriguez noted that Plaintiff was cranky, angry and frustrated that the noises in her head would not stop. A medication designed for use in the treatment of schizophrenia and certain symptoms of bipolar disorders was prescribed (Docket No. 12, pp. 350-351 of 408). |
| January 4, 2008 | Plaintiff suggested to her counselor that she had been victimized by her family during her recent trip to Texas and she was frustrated that her social security application was still pending (Docket No. 12, p. 355 of 408). |
| May 28, 2008 | Plaintiff had an anxiety attack and racing thoughts after her dog was attacked by another dog. Plaintiff had used her coping skills to "think out" a solution before responding to the attack (Docket No. 12, p. 379 of 408). |
| June 4, 2008 | Dr. Rodriguez conducted a medication reconciliation/progress review. There |

11

|  | were no changes in the diagnoses, medication protocol or side effects (Docket No. 12, pp. 386-387 of 408). |
|---|---|
| June 18, 2008 | Plaintiff suggested that therapeutic intervention had gone a long way to helping her address family stressors, deal with the attack of her dog and improving boundaries with her boyfriend, mom and sister (Docket No. 12, p. 387 of 408). |
| October 29, 2008 | Dr. Rodriguez conducted a medication reconciliation/progress review.  There were no changes in the diagnosis, medication protocol or side effects (Docket No. 12, pp. 384-385 of 408). |
| November 5, 2008 | Plaintiff expressed concern about anxiety related to driving and she felt the effectiveness of the medication regimen was questionable (Docket No. 12, p. 374 of 408). |
| January 4, 2009 | Plaintiff's mother expressed concern about Plaintiff's overall health and particularly the symptoms of paranoia and agitation (Docket No. 12, p. 372 of 408). |
| February 21, 2009 | Plaintiff advised Dr. Rodriguez that she had stopped taking Seroquel, a medication used to treat depression, in contemplation of getting pregnant (Docket No. 12, pp. 381-382 of 408). |
| March 3, 2009 | During a home-visit, Plaintiff advised that she was taking her medication and she needed to get out of the house.  The counselor reinforced the need to get engaged in the community to reduce depression and to work on understanding the correlation between mental health, physical health and overall wellness (Docket No. 12, p. 367 of 408). |
| April 2, 2009 | Plaintiff confirmed that she was taking her medication religiously and awaiting acceptance for a job or training through the Bureau of Vocational Rehabilitation (BVR) (Docket No. 12, p. 364 of 408). |
| April 4, 2009 | Dr. Rodriguez determined that there was no change in the diagnoses and continued the medication regimen (Docket No. 12, pp. 379-380 of 408). |
| April 13, 2009 | Plaintiff confirmed that while awaiting confirmation of job assistance from BVR, she was taking her medication daily and undergoing counseling on the role that nutrition and exercise had in the progression of mental health (Docket No. 12, p. 362 of 408). |
| October 5, 2009 | Plaintiff reported that she was doing well and the medication regimen had no side effects (Docket No. 12, pp. 401-402 of 408). |
| November 5, 2009 | Plaintiff reported that she was actively participating in therapy, including complying with the drug regimen (Docket No. 12, pp. 399-400 of 408). |
| November 11, 2009 | Dr. Rodriguez opined that Plaintiff had significant limitations in the ability to use judgment, maintain attention and concentration for extended periods of two hours, maintain regular attention and be punctual within customary tolerances, deal with the public, relate to co-workers, interact with supervisors, function independently without special supervision, deal with work stresses, complete a normal workday and workweek without interruptions from psychological-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Docket No. 12, pp. 389-390 of 408). |

January 22, 2010          A counselor prepared Plaintiff to testify at her SSI hearing (Docket No. 12, pp. 392-393 of 408).

## V. STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB is found at 20 C. F. R. § 404.1520.  DIB is available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past

relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VI. THE ALJ'S DECISION.

Taking into account the standard of disability set forth above, the ALJ considered the testimony, medical evidence and arguments to make the following findings of fact and conclusions of law:

1. Plaintiff met the insured status requirements of the Act on September 30, 2008 through March 31, 2011.

2. Plaintiff had not engaged in substantial gainful activity since August 23, 2005, the alleged onset date.

3. Plaintiff had the following severe impairments: Anxiety and Depression.

4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 404.925, 404.926).

5. After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels limited to simple, repetitive tasks but not in a fast paced production environment such as an assembly line. Plaintiff's interaction with the general public was limited to an occasional and superficial basis.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was born on June 27, 1979, and was 26 years old, which is defined under 20 C.F.R. § 404.1563(c) as a younger individual age 18-49.

8. Plaintiff had at least a high school education and was able to communicate in English.

9. Transferability of job skills was not material to the determination of disability in this case because using the Medical-Vocational rules as a framework supported a finding that Plaintiff was not disabled whether or not she had transferable job skills.

14

10.     Considering Plaintiff's age, education and work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

11.     Plaintiff was not under a disability, as defined in the Act, at any time from August 23, 2005 through March 25, 2010 (Docket No. 12, pp. 112-120 of 408).

## VII. STANDARD OF REVIEW.

Congress has provided a limited scope of review by the district court for Social Security administrative decisions under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  Therefore, the district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . .  *Id.*  This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VIII. POSITIONS OF THE PARTIES.

Plaintiff asserts two claims:

1.     The ALJ failed to accurately assess Plaintiff's credibility.
2.     The ALJ failed to apply the correct legal standard in evaluating the opinions of Dr. Barbara Rodriguez..

In response, Defendant argues that:

15

1.    The ALJ reasonably evaluated Plaintiff's credibility and the result is supported by substantial evidence.

2.    Dr. Rodriguez's opinions are not supported by the evidence.

### ANALYSIS.

### 1.    CREDIBILITY ANALYSIS.

Plaintiff argues that the ALJ arbitrarily selected facts that inaccurately characterize her as less than fully credible.  Had the ALJ examined the entire record consistent with substantive principles in Social Security Ruling (SSR) 96-7p, TITLES II & XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, he would have concluded that Plaintiff was fully credible.

### A.    THE LAW.

It is for the ALJ, and not the reviewing Court, to evaluate Plaintiff's credibility.  *Fairchild v. Colvin*, 14 F. Supp. 3d 908, 920 (S.D.Ohio,2014) (*citing Rogers v. Commissioner of Social Security,* 486 F.3d 234, 237 (6th Cir.2007)).  Accordingly, an ALJ's credibility findings are entitled to considerable deference and should not be lightly discarded.  *Id.* (*Casey v. Secretary of Health Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993)).  The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [a claimant] are reasonable and supported by substantial evidence in the record."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 476 (6th Cir.2003)).


When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  SSR 96-7p, at *4 (July 2, 1996).  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  *Id.*  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  *Id.*  It is not sufficient

to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.*

It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. *Id.* The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Id.* This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision. *Id.*

Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible. *Id.* The adjudicator may also find an individual's statements, such as statements about the extent of functional limitations or restrictions due to symptoms, to be credible to a certain degree. *Id.* A finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled. *Id.* All of the evidence in the case record, including the individual's statements, must be considered before a conclusion can be made about disability. *Id.* In fact, assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. *Id.* at *4 -*5. This includes, but is not limited to medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's

17

ability to work.  *Id.* at *5.

## B.  THE RESOLUTION.

Plaintiff identifies facts that the ALJ should have considered and the result that the ALJ should have rendered when assessing credibility.  The Magistrate, however,  will not consider the merits of these claims because consistent with the rules, the Magistrate may not second guess, undermine or discredit the ALJ's findings of credibility.  Rather, the Magistrate is limited to evaluating whether the ALJ's credibility determination was adequately supported by evidence in the record.

Here, the ALJ appropriately considered diverse factors in the credibility determination, including Plaintiff's testimony and objective medical records.  Specifically, the ALJ had doubts about Plaintiff's testimony as it relates to intensity and severity of impairments and work-related limitations of function.  The notable considerations that the ALJ used to assess Plaintiff's credibility follow.

First, the ALJ did not include any observations in the decision that Plaintiff was unable to closely and fully attend the hearing proceedings; that she failed to understand the proceeding; that she appeared to have difficulty sitting or rising; or that she appeared to be in pain or distress.

Second, the ALJ considered that Plaintiff's spouse died in August 2005, she stopped working in July 2006 and she started dating a new boyfriend during November 2006 and never sought employment during this time.

Third, the ALJ noted that Plaintiff and her boyfriend engaged in prolific substance abuse and Plaintiff sought mental health treatment for the first time in October 2007.

Fourth, the ALJ made it clear that when assessing credibility, he considered that even though Plaintiff had no functional or mental limitations, she claimed that she did not pursue work because she could not concentrate.  However, Plaintiff never sought less demanding work yet she was able to read and watch television most of the day.

18

Fifth, the ALJ noted that Plaintiff admitted that she could but refused to perform household chores. Again, she elected to watch television and read.

Sixth, the ALJ pointed to proof in the administrative record that Plaintiff could engage in social activities, particularly, dancing, traveling, shopping, visiting, attending religious services and eating out (Docket No. 12, pp. 116, 118 of 408).

The ALJ's conclusion that Plaintiff was not fully credible is supported by findings specific enough to enable a reviewing court to understand the array of objective factors considered in his reasoning. Accordingly, the Magistrate must give deference to the ALJ's interpretation of Plaintiff's testimony and the medical evidence in the context of credibility determinations.

2. **THE TREATING PHYSICIAN ANALYSIS**.

Plaintiff argues that the ALJ failed to properly articulate a controlling weight analysis consistent with *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375 (6th Cir.2013), and provide any reason for the weight actually assigned to Dr. Rodriguez's opinion.

A. **THE LAW**

The Commissioner imposes certain standards on the treatment of medical source evidence. *Id.* (*citing Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Generally, the opinions of a treating physician are given substantial, if not controlling, deference. *Warner v. Commissioner of Social Security,* 375 F. 3d 38, 390 (6th Cir. 2004). A physician is a treating source if he or she has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . .with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)]. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 407 (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1502). Treating physicians' opinions are only given such deference when supported by objective medical evidence. *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir.

2003)).  04.1520b).  Such evidence may contain medical opinions from a psychiatrist that reflect judgments about the nature and severity of the claimant's impairments, inclusive of symptoms, diagnosis and prognosis, physical and mental restrictions, and what the claimant can still do despite his or her impairments.  *Id.* (*citing* 20 C.F.R. § 404.1527(a)(2)).

As a general matter, treating-source opinions must be given "controlling weight" if two conditions are met:  (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."  *Id.* at 375-376 (*citing* 20 C.F.R. § 404.1527(c)(2)).  If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.  *Id.* at 376 (*citing* § 404.1527(c)(2)-(6)).  The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion.  *Id.* (*citing* § 404.1527(c)(2)).  These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* SSR 96–2p, POLICY INTERPRETATION RULING  TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *5 ( July 2, 1996)).  This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6[th]Cir.2004)).

**B.    THE RESOLUTION.**

This issue is resolved within the confines of the treating source-controlling weight paradigm.  The nature of Dr. Rodriguez's relationship was intermittent and thus, it was difficult to conclude that she had

an ongoing treatment relationship with Plaintiff.  Dr. Rodriguez saw Plaintiff on the average of 23 minutes once in 2007, three times in 2008 and twice in 2009 (Docket No. 12, pp. 350-351, 352-353, 380-381, 382, 384, 389 of 408).  Her therapeutic interventions were limited to changes in the pharmacological regimen based purely on Plaintiff's representations of psychiatric symptoms,  medication adherence and side effects.  There is no evidence that Dr. Rodriguez administered or used diagnostic assessment instruments, psychometric inventories or cognitive screens.  This evidence militates toward a finding that Dr. Rodriguez was not a treating source whose opinions were entitled to controlling weight.

While the ALJ was not bound to attribute controlling weight to Dr. Rodriguez's opinions, he did not summarily reject the probative value of Dr. Rodriguez's opinions.  The ALJ determined that Dr. Rodriguez's conclusions made in the MEDICAL SOURCE STATEMENT were consistent with other medical records that justified limitations (Docket No. 12, p. 118 of 408).  The Magistrate does not find that in making this determination, the ALJ misstated or misapplied principles of the controlling weight analysis.

## IX.  CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong

Date:   January 30, 2015                         United States Magistrate Judge

21